We'll hear the first orally argued case, Salah. Thank you. May it please the court. My client, a small businessman, wants a federal court to rule on whether he can use a trademark without infringing the rights of the other side. The other side says, we own the trademark and you can't use it in your business. How would you respond to the argument that this suit is somewhat premature, that your business is barely established? This is sort of the argument against you would be in India or Thailand. You don't have experience selling in the United States. You haven't taken intermediate steps like selling goods that aren't protected by trademarks. How do you respond to this view that there is somehow something premature about what you are trying to do? So I believe the facts are that our client has created an online business directed to both India and Thailand where he's selling apparel, specific apparel, including the specific trademark that's at issue here. And he did everything in a nine-month, 14-step process to get this business going. The only thing that he didn't do was to come into the United States with the goods. And he said- How about as of the time of filing? As I understand it, the business plan was only halfway through at that point and a lot of the activities that you allege came after filing, right? That is correct. He was five months within a nine-month process of doing that. But our position is that the time to look at this is when we amended the complaint. And I believe the district court erred in saying that activities after the filing of the original complaint were not to be counted because I think that's controverted by Matthews versus Diaz, which I apologize, we did not directly reference in our briefs, but that and Rockwell and Gale all say that with regard to a federal case, you can supplement the pleading and that's- So I understand that argument and setting aside for just a second, the time of the, whether the activities after in the amendment come in, as of the time of filing, is your argument that there was sufficient business activity for a case of controversy here? So after the time of filing, some of the acts were done, some were not. And they were all in preparation for the activity that he was going to pursue. And that, I believe, is okay. And you can also look at the facts thereafter to see if, in fact, the intent and the ability- But if the preparation is enough and halfway through a business plan is enough, doesn't that go to the concern that Judge Katzman raised that you're sort of asking for an advisory opinion that you're trying to feel out whether the business would be infringing on a trademark or not before you actually go all the way? So in this situation, I don't believe that to be the case because I believe there was enough meaningful preparation done at that point. The goods that were involved, the mark that was to be used in the U.S. were all set at that point. So I think they were ready and I think the cases suggest that when it comes to a trademark dispute, liberality is the means that one has to look at to see whether, in fact, there's really a real controversy here. One of the themes I thought sort of below the surface of the case was whether your client is a genuine online retailer or, I don't want to put it unkindly, but something like a trademark troll, someone taking advantage of the system. As we look at that, I was puzzled as to why the genuine retailer wouldn't think up his own trademark name. Well, in fact, he came up with two names, one of which was named here Selka. And in fact, the Selka mark has not, we obviously haven't gotten to discovering this case, but it's our belief and understanding that the Selka mark has not been used for many, many years. So in that case, I don't think it's fair to suggest that he's a trademark troll. He's adopted a mark, and if, in fact, he's correct, then he will be the senior user in the US. If he's not correct, he's gonna be an infringer and he's gonna stop. I asked you about the PTO proceeding. And so I appreciate your view that that proceeding does not divest this court of jurisdiction. But can you help me understand, from a practical perspective, what's the advantage to a parallel litigation on the single issue of the validity of the Selka registration? The only thing the PTO or the TTAB in this case would be able to rule on is whether the registrations are valid. And yes, perhaps we could take that issue and bring it back, but we would have to come back to the district court. So I'm sure we're likely not to have the happily agree that whatever happens in the TTAB is going to be binding. So we would have to come back to the district court to deal with the issue of common law claims. And it would not resolve the issue of whether Sala could sell in the US. All it would deal with is the registration. So that's a very convoluted process to get back to where we are today. Can I ask another practical question about the litigation here? Why, after losing in the district court on the issue of whether activities after the time of filing are part of the case or not, why don't you just start over and refile it? I presume that was without prejudice and rather than raising the same issue, going head on into the legal question on appeal. So in fact, and it's not in the record, I appreciate that, we did file a second suit. We're in that second suit. The plaintiff actually sold in the US the actual goods. But that doesn't resolve the issues that the district court resolved here with regard to the venue of this. And I think that's something that needs to be resolved here because we could easily have the very same issue in the second case. You'll have three minutes for rebuttal. Thank you, Your Honor. Morning again, Your Honors. I have a slightly unorthodox beginning, which is to tell you that I recently read about a debate tactic called the spread, which is a combined word of speed and reading. And in competitive debate, the debater will get up and very quickly read as many arguments as possible with the hope that the opponent can't respond to all of them and credit will be given for dropping arguments. And I think when we look at this, there's some of that going on here. There's been a lot of noise about what the right standard is, what the right record is, but Judge Katzmann, I think that your first question nailed the issue here. This case is premature. And the goal of my 10 minutes is to contrast the record here versus cases where the plaintiff has met its burden of proving by a preponderance of the evidence that the plaintiff had an imminent intent and ability, it's both, to use the SOCA mark in an infringing manner in the US. At this stage, counsel, don't we have to presume the truth of the allegations, the allegations that Salek claims that he wants to enter the market in the United States and that given the nature of modern e-commerce, he could do so in a matter of days. Why doesn't that establish intent and ability? And I agree with you that that is the test to expand into the United States. I understand the argument that perhaps e-commerce has changed things, but the case law doesn't support that. And when you think about the way commerce works, even e-commerce is not all that different from someone doing mail order, for instance. And when you look at the cases, one that I wanted to point to is Gelmart Industries. It's a Southern District case from 2014. E-commerce was well-established by 2014. And if you contrast the facts there, the court found that the plaintiff had been in business for more than 60 years. Here, the plaintiff is kind of cagey, but it looks like a couple of months, maybe. So why does that matter, necessarily? I mean, that's a factor to be considered, but the fact that something is only a few months old doesn't mean that it's not capable of doing business, entering a market. You're not suggesting, are you, that there be a certain number of years? That is a bright-line rule? Definitely not a bright-line rule, Your Honor, but I think what courts have looked at is whether there's commercial credibility about the ability to enter the marketplace. And we have to remember, MedImmune lowered the standard, but it didn't open the court. It's not a floodgate. It's not an invitation to hear cases that are still hypothetical. And in order to possess the ability, you go back to Gilmore. It's not hypothetical anymore. Between filing and the Second Amended Complaint, plaintiffs added a lot of allegations about the activities that they undertook during that time. So it seems like your position is just asking them to refile and include those allegations that were in the Second Amended Complaint. Isn't that just putting form over substance? Why would we make them do something that's just ministerial? My position, actually, Your Honor, would be even if you were to consider those activities, it still doesn't meet the standard, because what did they do after they filed? They registered seven domain names. They talked about launching the business in India and Thailand. But again, to bring it back to Gilmore, I just think it's very helpful to juxtapose it. You've got the 60 years, but in Gilmore, they had longstanding relationships with suppliers and manufacturers located in China, Indonesia, India, Bangladesh, and the Philippines, all of whom, they pleaded, could very quickly distribute goods in the United States. As far as we can tell, plaintiff has nothing of that sort. Even if you were to accept the allegations that were added to the complaint in the amended complaint. They also, in Gilmore, had pitched the product concept to major retailers. There's nothing like that here. They had multiple discussions. They had design and branding meetings on retailer interests. Again, that's not happened here. And when you take down, I don't wanna just focus on Gilmore. Yeah, I thought your argument was different, and not so much about what they did or didn't do, but whether the time and filing rule should be applied rigidly or not. I'm sorry, Your Honor. Whether the time and filing rule should be applied rigidly here or not. I thought that was the thrust of your argument. I think it's one of those cases, though, where I don't think that they should be allowed to rely on the allegations that they've added in the amended complaint. The case law seems pretty clear to me on that. Well, let's back up on that. Your adversary mentioned the case of Matthews versus Diaz, and Justice Stevens' opinion. Justice Stevens' opinion seems to establish that appellate courts can consider a pleading to be supplemented, even if no subsequent filing is made at all. So if that's the case, why doesn't that clearly cover a circumstance like this, where there is an amended complaint that is filed? I think that the way that case law, as I read it and understand it, if you are amending the complaint to fix the lack of allegations, not to change the reality of the situation that was pleaded, then the court will accept that. But this is, they are literally adding acts that could not have been pleaded at the time of the filing.  and I think for that reason, they should be ignored. But again, turning back to the core issue of whether this is premature, even if you were to consider those actions, you take a look at the Starter case in the Second Circuit, and it was a similar analysis to Gell-Mar. They looked there at Starter was a very established company. It was already using the mark that was at issue on apparel, and it wanted to use it on shoes. And the court there said, they designed styles and prepared prototype shoes. Here, as far as we can tell, it does look a bit like a troll, Your Honor, and it looks like they superimposed or digitally imposed a silica mark on the t-shirts. There are no prototypes. Now, you mentioned Starter. Wasn't that at least one part of it, at least partially abrogated by the Medellin case? Yes, the first, the imminent fear of suit is- But the second prong survives. Correct, Your Honor. And there, again, they started, conducted a consumer survey. They made strategic decisions regarding who should manufacture the shoes. They hired an external licensing agent. This all, again, goes to the issue that this is just premature. They haven't shown a serious commitment or investment to show that they could enter the U.S. market and use the mark in any infringing way. Well, what more could they, what more did they need to show at this stage? One of my favorite cases, Your Honor, to talk about what they could do is the Epos case, 636F2nd57, side of the District of Columbia. But that was a foreign company, it was an Israeli company, so it's more analogous to here. And again, the record is pretty impressive what they did. They sent employees on 10 trips to the U.S. market to market the pen. They went to a Las Vegas trade show. They had employees who were talking about this, it was a digital pen, in print and on television in the U.S. This idea that we're gonna open the floodgates because of MedImmune to anyone who can go online and reconfigure a website to accept orders that are never going to come because you have not penetrated the U.S. market, you have not advertised, you have not made any attempt actually at generating sales, that would be madness. And MedImmune doesn't stand for that. So is it your view that they actually have to take enough action to open themselves up to a damage award before they have satisfied the burden? I think, Your Honor, that MedImmune is pretty clear that you don't have to put your head on the actual chopping block. But that means that... But the gate isn't completely open either. So there is a ambiguous line, but this plaintiff is so far from it, hasn't shown any sincere preparation to sell it, any sincere ability to enter the U.S. market. From our point of view, it's not a close call here. But I take your point, Your Honor, that you do not actually have to begin the infringement, but you've got to show some commercial credibility and ability to penetrate the market in an infringing way. I can't see the clock. I apologize. Your 25 seconds. Well, Your Honor, then I just returned to the spread. I think here, if you put the spread aside and you cut through all the noise, the fact is this case is premature. The case law that Judge Preska relied on is insurmountable. Thank you, Your Honor. Thank you. You'll have three minutes. Thank you, Your Honor. Just wasn't clear to me on the record, but there is no parallel trademark trial and appeal board proceeding today. So Metamune talks about the totality of the circumstances and the reality of the business. This is clearly a small business, Your Honor, and he's sunk in a lot of money for him, and he doesn't want to go- $50,000. By now, it's a lot more. But yes, at that point, it was $50,000. And he doesn't want to be in a situation where he can't sell these goods. So he's done everything he possibly could up to coming into the U.S. on this record. And he's not done that because his counsel has told him, you're gonna be subject to infringement, and he's waiting for a court or counsel to tell him to go do that. So as far as we're concerned, he's done everything possible. And sure, it's a lot easier today to form a business than it was even 25 years ago. I mean, there are thousands upon thousands of businesses on Amazon these days that rely on outsourced vendors and that sell, and they don't have distributors, and they don't have a lot of the trappings of businesses used to have. But that's the reality, and I don't think that implicates whether or not you actually have a controversy here and whether you have a definite intent and ability to come into the market. And I think that's, technology has moved these things forward. The question is, you know, when does this become, when does this business become mature for a DJ action? Thank you, Your Honor. Thank you. Thank you both for your arguments. The court will reserve decision.